Filed 2/8/21  Kali v. Young CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAWN KALI, | D076121 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2015-00043052-CU-PO-CTL) |
| ROBERT O. YOUNG, | |
| Defendant and Appellant. | |

APPEAL from an amended judgment of the Superior Court of San Diego County, John Meyer, Judge.  Affirmed in part; reversed in part.

Williams Iagmin and Jon R. Williams for Defendant and Appellant.

Fell Law and Bibianne U. Fell, for Plaintiff and Respondent.

Plaintiff Dawn Kali underwent surgery for breast cancer in 2007.  Kali thereafter was introduced to the books and products of defendant Robert O. Young, dba pH Miracle Living, and ultimately in 2009, to Young himself.  In his books, Young claimed an alkaline diet and related alternative methods prevented and treated disease, including cancer.  Kali began following Young's treatment regimen.  Although her breast cancer returned, against

her doctors' recommendations she decided to forgo chemotherapy, radiation, and other traditional cancer treatment in favor of Young's methods.

Kali in July 2013 went to see an oncologist. A scan revealed her cancer had then progressed to Stage IV. Her treating oncologist testified at her October 2018 trial that Kali's cancer could be held in check for about three or four more years, then would resist treatment causing her death. Meanwhile, Young was tried and convicted of two felony counts, and pleaded guilty to two more counts, of practicing medicine without a license involving patients other than Kali.

In connection with this lawsuit,[1] Kali propounded written discovery including requests for admission (RFA), which requests Young never answered. At a January 6, 2017 hearing Young attended in propria persona, the court ordered the RFA deemed admitted. The January 6 order was served by mail on Young a few days later. Young, however, did not move to vacate the January 6 order until about 21 *months* later, near the close of evidence at trial, after Kali had moved for a partial directed verdict based on the admissions.

At the conclusion of a multiday trial, the jury awarded Kali $856,000 in economic damages; $5 million in past noneconomic losses; $84.5 million in future noneconomic losses; and $15 million in punitive damages. The trial court, in response to Young's new trial motion, on a conditional remittitur

---

[1] Kali also sued Ben Johnson, O.D., whom she had never met. Dr. Johnson at one point was Young's medical director while Kali was being treated by Young. Dr. Johnson was arrested in 2014 for aiding and abetting Young's unlicensed practice of medicine. The criminal charges against Dr. Johnson were dropped at the preliminary hearing. Kali in July 2018 dismissed Dr. Johnson from this lawsuit. Dr. Johnson ended up losing his license to practice medicine in California, including as a result of his "treatment," or lack thereof, of Kali.

2

reduced the jury's award for future noneconomic losses and punitive damages to $10 million each, which Kali accepted.

On appeal, Young claims the amended judgment must be reversed because the trial court abused its discretion in denying his motion to withdraw his admissions to the RFA based on his lack of response. Alternatively, he claims that, despite the trial court's reduction of the future noneconomic losses and punitive damage awards, they are still excessive and must be reversed, or further reduced either by this court or on remand.

As we explain, we conclude the trial court properly exercised its broad discretion in denying under Code of Civil Procedure[2] section 2033.300 Young's motion to withdraw his admissions. We also conclude that even with the court's reduction of the future noneconomic losses, it is still excessive based on Kali's shortened life expectancy due to harm caused by Young. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL OVERVIEW

*Kali*

In October 2007 Kali discovered a lump in her left breast. Kali sought advice from her aunt who also had breast cancer, leading Kali to consult with surgeon Nima Grissom, M.D. Dr. Grissom performed a lumpectomy on Kali that was determined to be Stage I cancer, "no lymph involvement." Dr. Grissom recommended Kali consult an oncologist and consider an additional surgery because Kali had an aggressive form of cancer. Kali in response again reached out to her aunt, as Kali was upset with Dr. Grissom because she believed the cancer was "out of [her] body" and no additional treatment

---

2    Unless otherwise noted, all future statutory references are to the Code of Civil Procedure.

3

was necessary. Her aunt recommended Kali read the book "Outsmart Your Cancer" before undergoing any additional medical treatment

Sometime in November 2007 after her surgery, Kali and her aunt went to see Justin Schmidt, a former student of Young who did microscopy. Schmidt recommended that Kali read the book "The pH Miracle" written by Young. Schmidt took a drop of Kali's "live" blood and viewed it under a microscope. He did the same with her "dried" blood.

After analyzing Kali's blood, Schmidt said it "needed cleansing," as it was "dirty" and she "wasn't very healthy." Schmidt also said her blood was very acidic and she needed to follow Young's protocol, which per Kali included: "12 weeks of liquid food, blended, pureed, juiced; no sugar; no fruit; no dairy; no meat; mostly just greens, avocado, cucumber, tomato." On Schmidt's recommendation, Kali went to the pH Miracle Center (Center), a 40-plus acre property or "ranch" located in San Diego County where Young lived and "treated" some of his "patients," where she purchased some "supplements" recommended by Schmidt.

Kali read "The pH Miracle" and another book Young authored called "Sick and Tired." She also started "juicing" and "blending" and took the "pHour Salts, the purified water drops, and the green powders" that she had purchased at the Center. Kali testified she followed Young's regimen, as recommended by Schmidt, because she then believed she was cancer-free and all she needed to do was "clean out [her] blood and get healthier."

Kali next saw Schmidt in May 2008 for a six-month follow-up. Schmidt told Kali her blood had "improved" as it was "cleaner," but continued to recommend she stay on, and become "more serious" about, the "liquid feast diet" espoused by Young. Kali in response followed Schmidt's directive, drinking up to a gallon of juice a day, alkaline water, and taking

4

supplements.  However, she testified it was difficult for her to stay one hundred percent liquid and alkaline.

Kali saw Schmidt a third time toward the end of 2008.  He told Kali her blood showed " 'lots and lots of improvements' " and she should continue with Young's program.  Kali believed Schmidt, telling the jury, "I felt like I had improved."  Encouraged, Kali stayed with the program, believing she was doing "okay."  Kali then was not overly concerned about her cancer diagnosis.

In November 2009, Kali decided to take Young's microscopy course.  She testified she was "fascinated" by Young's theories and believed his method had helped her "deal[] with cancer in a different way."  She also saw Young's program as a way to help others and as a means to start her own microscopy business.  Kali paid $10,000 to attend a week-long microscopy class at the Center taught mostly by Young.  She also paid about $7,000 to buy a microscope from Young, who claimed the microscopes sold at the Center were specially designed with "certain components" not elsewhere available.

Using slides and PowerPoints, in the classes Young went through the various shapes and sizes of blood cells and what they meant to a person's health.  Kali learned from Young during the week-long course that there was "only one sickness and one disease and that it's all the over-acidification of the blood and tissue"; that "people were just at different stages of what he called 'acidosis' and that it was all caused from the way you lived, ate, the food you drank"; that the focus is not on a person's blood cells, but on the "environment that the blood is in," and once that environment is healthy, the blood and tissue also would be healthy; and therefore, that a person needed to saturate his or her blood with alkalinity "to open the four channels of

elimination, which were: [u]rination, defecation, respiration, and perspiration."

Young told his class he had healed "thousands of people" through his program. Although he told the class he was not a medical doctor, he claimed to be a "research scientist, a microbiologist, [and] a naturopathic doctor." Young also told his students they were not to "diagnos[e]" a person based on the examination of his or her blood, but only to provide the person with "nutritional research counseling."

During one of the classes Young used a cancer patient as a volunteer to demonstrate microscopy, showing the class the severity of the man's disease through blood analysis. Young also analyzed Kali's blood during a class, using a large screen to share his technique with the other students. Young told Kali in front of the class that her blood "looked bad" as he saw cancer "markers" in it. Kali testified she was "devastated and terrified" by Young's remarks.

About a month after completing Young's class, Kali felt a small lump in her left breast. She testified she "freaked out," and immediately made an appointment to speak with Young. Kali then believed she was at fault for the return of her cancer because she had been unable to adhere "a hundred percent" to Young's program. She also believed having surgery in 2007 might have caused the return of her cancer, based on what she had learned from Young.

She added, "Young had taught that the tumor was, in fact, the solution to encapsulate the morbid molded cells to protect the rest of the body. And that it was a symptom and not the problem. And that the terrain, the inner terrain, the blood, where the blood—where the blood was bathing, that that was the issue. [¶] And so if you go in there and you cut out the tumor, that

6

you are disturbing the area, causing more problems and removing the solution and potentially spreading the cancer even further."

Kali paid Young $150 for a 10-minute call to discuss the lump in her left breast. Young reiterated his theories on cancer, telling Kali that "cancer was a liquid, not a cell,"; that "it was a condition that [her] body was in that gave rise to cancer"; and that the tumor was the "solution to the problem and that removing the tumor would only cause further problems" and make her cancer "worse." Young thus recommended Kali "fully" adhere to his program.

Despite Young's advice, Kali in December 2009 consulted with Dr. Grissom, who informed Kali the lump was "suspicious" but was still Stage I. Kali decided not to follow any of Dr. Grissom's recommendations, explaining she instead decided to adhere to Young's program and protocol, as she believed in his methods, research, and science.

In February 2010, Kali learned she was pregnant. Kali then found it difficult to strictly follow Young's program of a liquid diet. She started eating "acidic foods," including grains and fruits, believing her doing so was causing her body "grave damage." Feeling desperate, Kali in June 2010 e-mailed Young. Young invited Kali to stay at the Center and do a "work trade," where Kali could receive treatment in return for helping with patient care. Kali agreed.

In return for helping with patient care, Kali was provided food and lodging for about six weeks. Young also read her blood, telling her that she was in the "late stages of acidosis and that there was cancer markers in [her] blood." Young recommended Kali stay on a liquid diet, despite his knowledge Kali was four-months pregnant. Kali testified he also was "against prenatals." During her stay at the Center and thereafter, Kali for the "most part" followed Young's advice, although she did consume some solids. Kali

7

testified that although she had a tumor in her breast, she believed the tumor was merely a "symptom," and that it could not survive in an "alkaline environment."

Kali returned several times to the Center even after her six-week stay ended. Young continued to advise Kali not to have the tumor in her breast removed, telling her he did not believe it was cancerous. At his direction, in March 2011 Kali had some offsite "lab work[ ]" done. Young reviewed the lab work with Kali and told her she did not have cancer. Two months later, Kali had more blood work done. Young again reviewed the results with her, told her one of her cancer markers had gone up "two points," and it was time for her to "get more serious" about following his program. Young also advised Kali it was unnecessary for her to get a biopsy of the lump in her breast, stating it would just make "things worse."

Kali continued to receive treatment at the Center until October 2011, when she was hired by Young to work at the Center. About a month later, her son was born. Kali continued to work for the Center, but did so remotely after her son's birth, responding to e-mails received by the Center regarding Young's products and protocol. While at home, Kali continued to use Young's products and follow his program.

In January 2012, Kali had bloodwork ordered by her surgeon that showed her cancer markers were up. Kali had her labs sent to Young, as she then believed Young was her doctor and was treating her. They discussed the results. According to Kali, Young advised her the numbers did not matter because they were below 100, a threshold he deemed important, and encouraged her to follow his program "more strictly." Kali testified she then believed it was her "fault" for the increase in her cancer numbers because she was not one hundred percent committed to a liquid diet as Young taught.

8

She also then believed if she followed his program more diligently, it would cure her cancer.

In September 2012, at Young's direction Kali had more lab work. Young reviewed her results and told Kali her numbers were "back in [the] normal range." Kali testified she attributed the drop in her numbers to an April 2012 surgery by Dr. Grissom, after she had discovered yet another lump in her breast. Before deciding to have surgery, Kali spoke with Young, who advised against it, instead encouraging her to continue with his program.

About two weeks after the April 2012 surgery, Kali traveled from her home in the San Francisco Bay area to the Center. She then informed Young of her surgery. He in response told Kali that she was in "really bad shape" and that she "needed IVs" in order to saturate her blood and tissue using sodium bicarbonate, or baking soda. Young took Kali into his home and gave her the IV. Kali testified he did so because he did not want other staff to know he was giving patients IVs, as he then admitted he "wasn't supposed to be doing IVs." Kali recalled she stayed at the Center for about four days, and received another IV from Young during her stay.

In February 2013, Kali had more lab work done, again at the direction of Young. Young and Kali together reviewed the results. Young advised Kali her cancer markers were the highest they had ever been. Concerned her cancer may have metastasized, Young reassured Kali that it had not and that he was not concerned by the numbers, stating they "were just numbers" as they were still below the 100 threshold he considered significant.

Kali at about that time began to keep a diary to document her renewed commitment to Young's program. Kali did so after finding three small lumps in her lymph nodes, which Dr. Grissom advised were "highly suspicious."

9

Kali nonetheless opted to return to the Center for treatment with Young. She committed to follow Young's regimen strictly, even if it took a year, although she then recognized many patients under his care had died. She also pledged to avoid what Young called "stinking thinking," in which he claimed patients did not succeed in his program because they did not believe in it and their negative thoughts hindered its success. Kali believed her chances of surviving cancer were better using Young's program, as he advised, than undergoing chemotherapy, radiation, surgery, and other traditional medical treatment for the disease, which Young said would "kill" her.

In one diary entry from March 12, 2013, Kali wrote she had another "kick-your-ass IV" prepared by Young. She also wrote that she was relieved not to meet with her therapist, who was on a nine-week break, because Kali was experiencing "[f]lu-like aches all over" her body from the IV; and because her therapist "judge[d]" her for not "doing conventional treatment" to manage her disease. Kali testified she believed her therapist was "wrong" not to believe in Young's program over conventional medical treatment. As the days continued, Kali wrote in her diary that her back was hurting; that she was eating solids again despite fighting for her life; that she believed her cancer was getting worse, although Young told her otherwise; and that she was to blame.

Kali's lab results from March and May 2013 showed her cancer markers were significantly up, with the May results above 100, the threshold Young in the past had said was a key metric. Young reassured Kali the numbers were not important, and blamed the increase in her numbers on a ginger and turmeric drink she was consuming that he claimed was causing her "inflammation." Kali noted these tests were also showing "big problems"

10

with her heart. Young told Kali that the abnormal tests for her heart were the result of her drinking substances not on his approved protocol list. Kali testified she later learned the abnormal results were caused by the "PICC line" Young had insisted on in order to give her IVs.

Kali left the Center in July 2013. She testified at that point her cancer markers had dropped "20 points." Although feeling better, she believed her cancer needed to be monitored. Rather than fly to the Center and pay for medical tests as she had been doing, she decided to use insurance and consult with an oncologist, Dr. Garrett Smith, who had been recommended by Dr. Grissom. As a result of her lab results, Dr. Smith recommended Kali undergo a "PET scan." Kali agreed.

Dr. Smith informed Kali that the results of her scan showed she had Stage IV cancer; that her cancer was "up and down" her spine; that "50 percent of her femur [was] gone"; and that it was detected in her chest and lymph nodes. He recommended she immediately begin treatment, and warned her bones could easily break, including her hip, which could delay treatment and lead to her death. While still in the doctor's office, Kali called Young. Young told Kali to follow Dr. Smith's advice.

In October 2013, Kali saw an Internet post made by Young, after Kali had sent him "before and after PET scans" showing her cancer was in remission after undergoing treatment with Dr. Smith. According to Kali, in this post Young claimed the "pH Miracle diet" was in part responsible for Kali's remission. Kali then did not ask Young to remove the post, as she still believed following his program, in addition to the medical treatment she was receiving from Dr. Smith, were responsible for her remission.

Kali testified she lost faith in Young and his program in early 2014, after his arrest. Shortly thereafter, an investigator from the San Diego

11

District Attorney's Office contacted Kali. She told the investigator what she had been instructed to say while Young's patient: that Dr. Johnson was her doctor; that he handled all of the IVs; and that she had nothing else to share. After suffering more personal setbacks, Kali decided to cooperate with the investigator after he again contacted her in November 2015, about a month before Young's criminal trial commenced. At that point Kali told the investigator the "truth" about Young and the Center. Kali appeared as a witness in the criminal case against Young.

During the criminal trial, Kali admitted in 2012 she earned $125,000 working for Young and the Center. Kali testified in the instant case that she also earned about $80,000 in 2011; and that in the first eight months of 2013, she earned almost $70,000. She further testified this income was by far the most she had earned over about a three-year period.

As a result of Young's criminal trial, Kali testified she learned that all of his "doctorates were done online . . . in an eight-month period"; and that Young was not in fact a doctor. She added, "There was no research. There was no testimonials. And the people that came forward to say that they have been cured, I think it was one, didn't have anything from a medical doctor following up to say she no longer had cancer." Kali concluded Young's program "didn't work," and could not have cured her cancer as he had promised.

*Kali's Oncologist*

Portions of Dr. Smith's October 2018 deposition testimony were admitted at trial. Dr. Smith had consulted with Kali a week before his deposition. He testified Kali's predominant active cancer was in her spine and hip. Dr. Smith testified that Stage IV cancer meant it was incurable, as there is no Stage V; that in treating Kali his hope was to slow down the

12

progression of the cancer for as long as possible; that upwards of 90 percent of Stage I breast cancer of the type Kali was diagnosed with "can be cured"; that he was unaware "of any scientific evidence that looks at body pH as a risk factor for breast cancer"; and that there is "no scientific evidence that an alkaline diet has any effectiveness against cancer," because the pH of the food eaten by a person "is rapidly neutralized by [a person's] acid stomach environment."

Dr. Smith confirmed Kali's testimony, summarized *ante*, including that her cancer had spread "most critically in her spine," which in certain areas showed a bone loss of 50 percent; and that Kali therefore was at an "incredibly high risk for breaking that bone," including merely by sneezing.

Based on his thorough review of all her medical records, Dr. Smith opined that Kali's cancer would have been curable if she had sought treatment sooner, including in 2007 or 2009 when she consulted with her surgeon, as early intervention in treating breast cancer is "everything"; that Kali also would likely not be in the situation she found herself at the time of trial if she had followed Dr. Grissom's recommendation to see an oncologist after undergoing surgery in 2012; and that in his estimation, Kali "is looking at three to four years left before we lose complete control of her breast cancer," and then "it is inevitable that she will die" from this disease. When asked if it was "possible" Kali could live another 20 years, Dr. Smith opined that, in his 25 years of taking care of women with the same type of cancer as Kali, with reasonable medical certainty the "answer [is] no."

With regard to the IVs Kali was receiving at the Center, Dr. Smith described them as a mixture of baking soda—the "yellow box in your refrigerator"—added to "normal saline" that was dripped into a person's

blood. Dr. Smith opined giving a person sodium bicarbonate IVs could be "very dangerous," as it could damage a person's kidneys.

Dr. Smith was also questioned about the cost of Kali's treatments. As of about October 2018, he testified Kali had had 124 office visits since July 2013, when she first consulted him. Using a weighted "average" of the costs associated with these "treatment visit[s]," Dr. Smith testified the total billed to Kali's insurance was $720,000. Dr. Smith noted that insurance typically paid about 80 percent of the total amount billed; that his office had been paid $576,000 to treat Kali since her diagnosis in July 2013; and that because Kali likely did not have five years left to live, her future medical expenses would be about $280,000.

Dr. Smith discussed the role of Kali's mother and aunt in Kali's treatment decisions. Dr. Smith testified he twice treated Kali's aunt for her own breast cancer and also met the aunt when she accompanied Kali for one of Kali's medical visits. He noted Kali's aunt was "extremely fearful" and "extremely distrusting of the medical establishment"; that the aunt had also influenced Kali's mother, who accompanied Kali on her first office visit in July 2013 and many other visits; and that because he met and treated Kali's aunt, he saw firsthand the "tremendous dynamic" and "intense pressure" Kali was under from both her mother and aunt in deciding to go forward with conventional medical treatment.

Dr. Smith added, "I think for the first two years, all of 2013, every decision [Kali] made was criticized by both her mother and aunt. 'You're going to kill yourself if you do that.' It was a very stressful situation that she was under"; and, "The mother rejected traditional medical care, put a lot of pressure on [Kali] not to do traditional medical care. And every time her

14

mother was in the office, she proposed an alternative therapy idea and asked my opinion about all of them."

*June Asisi*

Asisi testified she worked as the general manager of, and the accountant for, the Center from June 2010 until the end of March 2013. Asisi was responsible for everyone who worked at the Center, which she estimated at one time was about 22 employees. Along with Young, his wife Shelly Young, and attorney John Baird, Asisi sat on the executive committee of the company, pH Miracle Living.

Asisi testified she witnessed discussions between Baird and Young in which Baird repeatedly explained that Young should not be "administering medical procedures, should not be diagnosing, [and] should not be administering IVs without a medical doctor's supervision." Before Dr. Johnson was hired in June 2012 to obtain medical supplies and oversee procedures at the Center, Young obtained supplies from a holistic practitioner. According to Asisi, Young and his staff would hide the fact he was giving patients IVs without medical supervision.

Asisi was working at the Center when medical board investigators in May 2011 made an unannounced visit. Asisi testified she immediately informed Baird about the investigators. The investigators told Asisi they had received complaints about the Center, including that IVs were being given on the property. Asisi testified she then told investigators no IVs were being given, even though she knew the opposite was true, adding, "I have no excuse for myself." She also admitted to intentionally keeping the investigators away from the buildings where patients of the Center were staying, including a patient who was then receiving an IV.

After this incident, Young instructed Asisi to remove all IV supplies from the Center. Along with another office employee, Asisi testified they loaded the IV supplies into a pickup and drove them to a "shed" on the property where another Center employee lived. Asisi recalled they made a "couple of trips" to remove the supplies, and it took about four hours.

Asisi testified an IV at the Center cost a patient $500. Asisi estimated the cost of the supplies in the IV was between $10 and $20. In fall 2012, Young instructed Asisi to remove all the patient files kept at the Center, after medical board investigators had contacted a former Center employee. Asisi in response arranged for the medical records to be transferred to off-site storage.

According to Asisi, Young's approval was required before a patient could stay and receive treatment at the Center. In addition, a patient needed to pay upfront for a week's stay before he or she arrived. Asisi stated it typically cost $2,000 a day to stay at the Center, excluding the costs of IVs; the live and dry blood analysis, which she estimated ran between $1,000 and $1,500; and other treatment options. Young instructed Asisi not to give any partial refunds if patients left the Center early, before their stay had concluded.

In 2011, Asisi testified the Center generated between $3 and 3.5 million in revenue; and in 2012, it was over $5 million. Because she was only at the Center for about three months in 2013, Asisi was uncertain of the revenue for that year. In addition to receiving a salary and dividend checks, Asisi testified Young and his wife also were reimbursed for personal travel, and for taking care of property other than the Center, including dozens of timeshares they owned. Asisi estimated reimbursement for these personal expenses was over $1 million a year.

16

In fall 2012, at Dr. Johnson's recommendation Young created the pH Miracle Private Medical Foundation, which entity was used to pay the Youngs. Asisi testified once the Foundation was established, she prepared a form that every Center employee was required to sign as a condition of employment. The form included a confidentiality clause preventing an employee from talking to law enforcement.

Asisi recalled having conversations with Young about patients who appeared to be very ill. In one instance, Asisi recalled an Australian woman with Stage IV cancer came to the Center for treatment. Young instructed Asisi that this patient was to be removed from the Center "if she looked like she was going to pass away." Young gave similar instructions to Asisi about another patient. Asisi thus recalled an incident when she told a patient's father that he needed to put his son in the car and leave because his son was too ill to remain at the Center.

Asisi also testified in summer 2012 she overheard a conversation between a patient and Young after the patient told Young he was out of money. The patient offered Young gold Krugerrands that he kept at his Las Vegas home in trade for remaining at the Center. Young agreed. Asisi testified the patient ended up staying only a short while longer, then "gave up," "went home, [and] passed away within a month." About a week after the patient left the Center, Young instructed Asisi to drive to Las Vegas and obtain the gold Krugerrands from the patient.

Young also treated Asisi for her Type II diabetes while she worked at the Center. Asisi testified Young instructed her to stop taking her diabetic medicine and instead use "his products," as her problem was intestinal and salt, not sugar. Asisi followed Young's advice for about two months, then experienced medical problems she attributed to his program and advice.

17

Although Young instructed Asisi and his other patients to follow his strict liquid diet, Asisi testified she witnessed Young eating foods "normal people" ate, such as pizza, chips, and eclairs.

Asisi testified she overheard Young several times tell patients that his program could "cure" prostate and breast cancer, and Type I diabetes. As the Center's accountant, she also testified that Young and the Center had "at least seven foreign bank accounts"; and that when a patient paid cash to stay at the Center, she would put the money in an office safe where it remained until removed by Young.

*Investigation and Arrest of Young*

Investigator James Clark of the San Diego District Attorney's Office testified he spent about three years investigating Young and the Center, which investigation culminated in the arrests of Young and Dr. Johnson in early 2014. Clark first spoke with Kali in February 2014. She then stated she was a "rep" at the Center and was managing her cancer. At that point, Kali was "extremely supportive" of Young.

In October 2015, shortly before Young's criminal trial commenced, Clark again contacted Kali. According to Clark, she admitted not being forthright when they had first spoken in 2014. Kali then was much more candid about Young and the activities that went on at the Center. She also confided her cancer had become much more serious while under Young's care.

Clark testified he participated in the lawful search of the Center. During the search law enforcement confiscated various computers, which they impounded but later returned to Young; and 351 "patient files, actual physical manila folders with documents inside." Of the 351 files confiscated, Clark testified that 81 were from cancer patients; that as part of his investigation, he sought to determine how many of those patients were still

18

alive by contacting them directly and/or their family members; and that in some cases he was able to obtain "death certificates for people that [he] knew had passed away, or [use] law enforcement database checks on people which were able to provide information that the person had died."

Based on "death certificates" alone, Clark first testified that he did not have an "accurate number" how many of the 81 or so cancer patients had died. Without objection, he then added, "[B]ut I think we might had had—I don't know how accurate this number is, but I think we may have had 15, 12 to 15 that we actually got death certificates back. It could be higher; it could be lower. I'm not accurate on that."

*Young*

Young also testified in the instant case. He admitted both in his criminal case and at trial here that he did not have "any post-high school educational degrees from any accredited schools"; and that he was not a microbiologist, hematologist, a medical or naturopathic doctor, or a "trained scientist." He also admitted in 1996 he was charged in Utah with, and pleaded guilty to a misdemeanor of, practicing medicine without a license.

Young authored four books and various articles regarding the "pH Miracle" and how it helped common diseases and/or conditions, including cancer. Young testified his books have sold more than 10 million copies. His writings included his belief that, "to this day, most doctors and many patients still believe that a cancer is a physical thing, a tumor. In reality, a tumor is the solution of cancer, not its cause. A tumor is simply a physical manifestation of bound-up acidic cells so they do not spoil other healthy cells."

19

Young also wrote, "The truth is cancer is not a cell, but an acidic, poisonous liquid.  When a person, quote, has cancer, what they really have is cancerous tissues or latent tissue acidosis.  They are absorbing their own acidic urine"; and, "[t]hese diseases"— "cancer, heart disease, diabetes, osteoporosis, lupus, arthritis, Alzheimer's, are simply misnamed and I believe that they are intentionally misnamed to put the jargon out of reach of everyday people.  As a result, there's a great deal of arrogance in the language of western medicine.  This arrogance furthers the language of separation.  Separation never results in healing."  Young testified that he continues to agree with these and his other writings; and that he did not believe the common cold or the flu was caused by a virus, but instead was the body's means of expelling "acidic waste" to maintain the pH of the blood.

Young denied ever telling employees of the Center to hide IV supplies from investigators, as testified to by Asisi.  Young claimed he first learned that employees were hiding IV supplies during the criminal trial.  He further claimed he was surprised to learn that because Dr. Johnson was the one ordering IVs from about June or July 2012 until their arrests.

Young denied being Kali's doctor, treating her, or ever diagnosing her, although he admitted doing microscopy of her blood.  Young testified his analysis was qualitative, not quantitative, as he viewed her red blood cells under a compound microscope in what he described as "subjective science."  He denied telling Kali through blood analysis that her blood cells showed she did or did not have cancer.

Young admitted reviewing Kali's lab results with her, and making comments to her about her "numbers" or "cancer markers."  He denied, however, making comments whether or not those numbers should be of concern to Kali.  He also denied telling her not to get a biopsy of the lumps in

20

her breast and armpit, not to consider surgery, or not to undergo chemotherapy, radiation, or similar treatment. He also denied physically touching Kali, including feeling the lumps in her breast; and giving her IVs, noting if she received IVs while at the Center that was under the direction of Dr. Johnson.

*Procedural History Including the RFA*

Kali in December 2015 filed suit against Young (and Dr. Johnson, as noted in fn. 1 *ante*) alleging among others causes of action for fraud and negligence. Kali sought compensatory and punitive damages based on allegations that Young made myriad false and misleading representations of fact, including that he was a doctor and his treatments would help with her cancer. The complaint also alleged that Young advised Kali not to have her tumors removed, nor to undergo conventional medical treatment for her disease; and that, while under Young's care, her cancer went from being treatable Stage I, to uncurable Stage IV. As noted, Young denied these allegations, and continued to deny them at trial.

In July 2016, Kali propounded the RFA on Young. There were 30 RFA in total, and all of the RFA except for one[3] asked Young to admit (or deny) allegations that tracked the various elements of Kali's causes of action against him. Young, however, did not respond to the RFA as required under the statute, nor has he ever responded to them.

---

[3]    Request No. 30 asked, "Admit that, as a result of the SUBJECT INCIDENT [as defined in the RFA], PLAINTIFF has been damaged in the amount of $10,000,000 (ten million dollars)."

On January 6, 2017, the court granted under section 2033.280[4] Kali's unopposed motion for an order deeming Young's failure to respond to the RFA an admission to all such requests. The minute order shows Young attended that hearing and was also served with the court's order by mail three days later. On October 23, 2018, a day after trial had begun, Kali sought a request to enforce the court's January 6 order deeming the RFA admitted for the truth as specified in each request.

In her October 23 request, Kali noted that about 21 months had passed since the court's January 6 order; that during this period, not once had Young "communicated an intent to or made any effort whatsoever to set aside the deemed admitted [RFA] under . . . section 2033.300"; and that "when Mr. Young retained an attorney, on or about August 15, 2018, to respond to and oppose Plaintiff's motion for terminating sanctions for [Young's] repeated failure to attend his court-ordered deposition, his attorney, Mr. Conrad Joyner[, also his trial attorney], was provided notice that Plaintiff's [RFA] were deemed admitted by the Court, and that the sole issue at trial would be

_____

4      Section 2033.280 provides in relevant part: "If a party to whom requests for admission are directed fails to serve a timely response, the following rules apply: [¶] (a) The party to whom the requests for admission are directed waives any objection to the requests, including one based on privilege or on the protection for work product under Chapter 4 (commencing with Section 2018.010)." Subdivision (b) of this statute provides the "requesting party may move for an order that the genuineness of any documents and the truth of any matters specified in the requests be deemed admitted, as well as for a monetary sanction." Finally, subdivision (c) provides that unless a party has served a proposed response to the requests for admission that is in "substantial compliance" with section 2033.220, the court shall order any matters specified in the request admitted and shall impose a monetary sanction on the party or attorney, or both, "whose failure to serve a timely response to requests for admission necessitated this motion."

damages. . . . . Since that time, as well, Mr. Young has made no effort to set it aside."

On October 24 before Young's testimony summarized *ante*, Kali's counsel read to the jury 23 of the 30 RFA deemed admitted by the court's January 6, 2017 order, covering ultimate issues regarding liability, causation, and damages. Immediately prior to being read, the court without objection gave the jury the following explanation: "Ladies and gentlemen, as part of the discovery process the law allows a party to make a written request for admissions as to alternative facts. And those requests are served, and they have to be answered within a certain period of time. And they can either be admitted or denied. And if they are denied, they have to give reasons why they can't answer; the other side.

"If the requests for admission are not responded to within a certain amount of time, then the law allows the party propounding the request to seek an order from a judge that the requests are deemed admitted because of the failure to respond."

The following day Kali filed a motion for a partial directed verdict under section 630, subdivision (a) based on the 23 admissions. In the October 25 motion, Kali noted the 23 admissions "covered every liability and causative element" she would have to prove to meet each element of her causes of action against Young.

The court on October 29 informed the parties outside the presence of the jury that it was inclined to either deny without prejudice or not rule on the directed verdict motion. The court told the parties it wanted the jury to answer "all of the questions" on the verdict form, reasoning as follows: "I want to get a full record. I just want this case to be tried once, and you just

23

never know with the Court of Appeal what they are thinking, and particularly under the circumstances with regard to the motion.

"But it's interesting. I'm not denying it. I'm just deferring. I'm just not going to rule on it in the event that there's a—well, you've got post-trial motions that could take care of things. So it's more of a pragmatic determination."

This same date, Young's counsel informed the court that he had prepared a motion to withdraw the admissions. He candidly told the court that he had "just discovered a new code section called 2033.300" on which the motion was based; and that up until then he had believed it was too late to move to withdraw the admissions because he was under the impression that the only way to do so was under the discretionary portion of section 473, subdivision (b),[5] which required a party to seek relief within six months of an order or judgment. When further questioned by the court why he did not try to bring a section 473 motion—even if tardy—at least to have a record, counsel answered, "Attorney error," adding he was overwhelmed when he substituted into the case and just "blew it."

The court on October 30 denied Young's motion to withdraw the admissions. The court found the requirements of section 2033.330 were not met, Kali would be " prejudice[d]" if the motion was granted, and the jury already had been read 23 of the admissions.

---

[5] Subdivision (b) of section 473 provides in part: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect. Application for this relief shall be accompanied by a copy of the answer or other pleading proposed to be filed therein, otherwise the application shall not be granted, and shall be made within a reasonable time, in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken."

24

The record shows Kali's counsel agreed with the court's ruling, reminding the court that because Young had never moved to withdraw the admissions, plaintiff had not "work[ed] up experts" in preparation for trial in reliance on the court's January 6, 2017 order finding the RFA were conclusively admitted. Plaintiff's counsel nonetheless argued the "best protection" to ensure the case was tried fairly was *not* to read the jury instruction concerning the admissions, but instead to tell the jury to decide the case based on the evidence. The court agreed, noting, "I was thinking the same thing."

During closing, Kali's counsel noted the verdict form had a number of questions on it. She further noted that Kali as plaintiff was required to prove her causes of action to obtain compensatory and punitive damages; that the jury should *not* consider the 23 admissions when answering the questions on the verdict form; and that the jury instead should rely on the evidence from witnesses and documents that had been admitted at trial.

Specifically, plaintiff's counsel argued, "Now, you heard, in the trial, requests for admissions that were read. We are not asking you to use those requests for admissions, *we are asking you to judge the rest of the evidence.* Those requests for admissions will be dealt with after the trial is over. So you don't need to worry about that, okay? So I'm going to be talking about the rest of the evidence that came from witnesses and came from documents." (Italics added.) The record shows plaintiff's counsel then went through the 32 questions on the nine-page verdict form, relying on the evidence proffered at trial—and not on the admissions—in arguing plaintiff had satisfied her burden of proof.

As noted *ante*, the jury returned a verdict awarding Kali $856,000 in past and future economic losses, $5 million and $84.5 million in past and

future noneconomic losses, respectively, and $15 million in punitive damages. The jury further found Kali was not contributory negligent in causing her harm. As also noted, Kali's awards for punitive damages and future noneconomic losses were subsequently remitted to $10 million each.

DISCUSSION

I

Denial of the Motion to Withdraw the RFA Deemed Admitted

A. *Guiding Principles*

A party may request that another party to the action "admit the genuineness of specified documents, or the truth of specified matters of fact, opinion relating to fact, or application of law to fact. A request for admission may relate to a matter this is in controversy between the parties." (§ 2033.010.) A party served with requests for admission "shall respond in writing under oath separately to each request" (§ 2033.210, subd. (a)) by either answering the "substance of the requested admission" (*id.*, subd. (b)), or setting forth "an objection to the particular request." (*Ibid.*) Absent court order, the party served with requests for admission shall provide a response within 30 days after service. (§ 2033.250.)

In the event a response to requests for admission are not timely served, the "party to whom the requests for admission are directed waives any objection to the requests, including one based on privilege or on the protection for work product under Chapter 4 (commencing with Section 2018.010)." (§ 2033.280, subd. (a).) The requesting party may move for an order—as Kali did on January 6, 2017—that the "truth of any matters specified in the requests be deemed admitted, as well as for a monetary sanction." (*Id.*, subd. (c).) Matters that are either admitted or deemed admitted by court order are "*conclusively established* against the party making the admission in the

26

pending action," unless the admitting party obtains leave of court under section 2033.300 to amend or withdraw the admission. (§ 2033.410, subd. (a), italics added.)

Despite defense counsel's assertion at trial that section 2033.300 is "new," this statute became operative on July 1, 2005. (See Stats. 2004, ch. 182 (Assem. Bill 3081), § 23.) Section 2033.300 provides: "(a) A party may withdraw or amend an admission made in response to a request for admission only on leave of court granted after notice to all parties. [¶] (b) The court may permit withdrawal or amendment of an admission only if it determines that the admission was the result of mistake, inadvertence, or excusable neglect, and that the party who obtained the admission will not be substantially prejudiced in maintaining that party's action or defense on the merits. [¶] (c) The court may impose conditions on the granting of the motion that are just, including, but not limited to, the following: [¶] (1) An order that the party who obtained the admission be permitted to pursue additional discovery related to the matter involved in the withdrawn or amended admission. [¶] (2) An order that the costs of any additional discovery be borne in whole or in part by the party withdrawing or amending the admission."

Thus, a party is entitled to withdraw or amend admissions under section 2033.330 only if the court finds *both* that there was "mistake, inadvertence, or excusable neglect" *and* that "the party who obtained the admission will not be substantially prejudiced in maintaining that party's action or defense on the merits." (§ 2033.300, subd. (b).) We apply an abuse of discretion standard in reviewing a trial court's ruling denying a motion to withdraw admissions. (*Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233 (*Elston*), superseded by statute on another point as stated in *Tackett v. City of Huntington Beach* (1994) 22 Cal.App.4th 60, 64.)

27

"The trial court's discretion in ruling on a motion to withdraw or amend an admission is not unlimited, but must be exercised in conformity with the spirit of the law and in a manner that serves the interests of justice. Because the law strongly favors trial and disposition on the merits, any doubts in applying section 2033.300 must be resolved in favor of the party seeking relief. Accordingly, the court's discretion to deny a motion under the statute is limited to circumstances where it is clear that the mistake, inadvertence, or neglect was inexcusable, or where it is clear that the withdrawal or amendment would substantially prejudice the party who obtained the admission in maintaining that party's action or defense on the merits." (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1420–1421 (*New Albertsons*).) An error is excusable if a reasonably prudent person under the same or similar circumstances might have made the same error. (*Solv–All v. Superior Court* (2005) 131 Cal.App.4th 1003, 1007 (*Solv–All*) [analyzing relief upon the existence of "mistake, inadvertence, surprise, or excusable neglect" provided under section 473, subd. (b)].[6])

B. *Analysis*

We conclude the court here properly exercised its broad discretion in denying Young's motion to withdraw the admissions. We note the timing of this motion alone was grounds to deny it. Despite waiting almost 21 months from the date the requests were deemed admitted; and despite filing on October 18 a motion in limine to exclude evidence of Young's criminal history in Utah, and also a request for judicial notice seeking to admit a portion of the transcript of Kali's testimony from his criminal trial among other

---

[6] Section 2033.330, subdivision (b) does not include "surprise" as a basis for a court to withdraw admissions. Nor does section 2033.330 include a time limit when relief under this statute must be sought, in contrast to the six-month requirement in section 473, subdivision (b). (See fn. 5 *ante*.)

documents, Young did not move for relief under section 2033.330 until the trial was nearly over.  (See *Stover v. Bruntz* (2017) 12 Cal.App.5th 19, 31 [noting a mother who failed to timely respond to requests for admission regarding child care costs, and then failed to move for relief from the court's order deeming those matters admitted, held to have admitted she incurred no such costs].)

What's more, Young moved for relief only *after* 23 of the 30 admissions had been read *without objection* to the jury, and only *after* Kali had moved for a partial directed verdict on the issues of liability and causation based on the admissions.  (See *Clemens v. American Warranty Corp.* (1987) 193 Cal.App.3d 444, 451 (*Clemens*) [observing that the purpose of a motion in limine " 'is to avoid the obviously futile attempt to "unring the bell" ' "].)  Under these circumstances, Young's dilatory response in seeking to withdraw the admissions was inexcusable.  (See § 2033.300, subd. (b).)

We separately conclude Young's counsel's excuse in waiting to seek relief under section 2033.330 also warranted denial of the motion.  The record shows that Young's counsel knew about the admissions in late August 2018, when he substituted into the case in order to respond to Kali's renewed motion for terminating sanctions.  In that motion, Kali pointed out that the court previously had ordered the RFA deemed admitted; that Young to date had not moved to set aside the admissions; and that Kali had "reasonably relied on these admissions . . . in prosecuting her case to trial on the sole issue of damages."  However, when he filed the motion to withdraw the admissions, Young's counsel admitted he had just discovered this "new" statute—section 2033.330, as he was under the (mistaken) impression that the time to seek relief from the admissions had past based on his reading of section 473, subdivision (b).

29

We conclude a reasonably prudent practitioner operating under the same circumstances as Young's counsel would have been aware of the statutes governing RFA, including section 2033.330; and would have raised the issue of the admissions in the months leading up to the trial, or at the latest, in an in limine motion, as the trial court here also noted. (See *Clemens*, *supra*, 193 Cal.App.3d at p. 451.)

We therefore conclude Young's counsel's ignorance of the law regarding the admissions, including the relief available under section 2033.330, was inexcusable. (See e.g., *Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 258 [concluding that the "discretionary relief provision of section 473 only permits relief from attorney error 'fairly imputable to the client, i.e., mistakes anyone could have made' "; and that " '[c]onduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not therefore excusable' "]; see also *Solv–All*, *supra*, 131 Cal.App.4th at p. 1007 [noting to find an error excusable under the discretionary portion of § 473, subd. (b), the "standard is whether ' "a reasonable prudent person under the same or similar circumstances" might have made the same error' "], quoting *Bettencourt v. Los Rios Community College Dist.* (1986) 42 Cal.3d 270, 276; *State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 611–612 [noting where " 'the court finds that the alleged mistake of law is the result of professional incompetence based upon erroneous advice [citation], *general ignorance of the law* or lack of knowledge of the rules [citation], or *unjustifiable negligence in the discovery or research of the law*, laxness or indifference [citations,] normally relief will

30

be denied'" under the discretionary portion of subd. (b) of § 473], italics added.)[7]

Young claims the size of the compensatory and punitive damages awards in this case is prima facie evidence of the prejudicial effect the admissions had on the jury. We disagree. Although 23 of the admissions were read to the jury, as noted during closing Kali's counsel specifically told the jury not to consider the admissions in deciding the case. Moreover, the court also denied without prejudice Kali's partial directed verdict motion, noting it wanted the jury to rely on the evidence in deciding the case.

In addition, the jury was provided with a lengthy verdict form that required it to make findings on the ultimate issues in the case; and, other than the amount of some of the damages it awarded, on appeal Young has not disputed the jury's findings in this case, including that he was guilty of "oppression, fraud, or malice" entitling Kali to punitive damages. (See Civ. Code, § 3294, subd. (a).) In our view, the question of whether relief is available under section 2033.330 must be determined at the time such relief is sought, and not be based on the outcome of a case.

In arguing that we should resolve doubtful cases in his favor, Young relies on *Elston*. In *Elston*, our high court found the trial court abused its discretion in refusing to set aside admissions on the ground of excusable neglect. There, the trial court denied discretionary relief under former section 473 and eventually granted summary judgment in favor of the

---

7    These same circumstances also support a finding that Kali would have been substantially prejudiced had the court granted Young relief under section 2033.330, as the record shows Kali had relied on the admissions in preparing her case for trial. (See *New Albertsons, supra*, 168 Cal.App.4th at pp. 1420–1421.)

defendant on the basis of the admissions. (*Elston, supra,* 38 Cal.3d at pp. 231–232.)

In reversing, the *Elston* court noted that the plaintiffs' attorney within eight days of receiving notice moved to set aside the admissions while at the same time responding to the requests; that the defendant failed to show prejudice if such relief was granted; and that the plaintiffs' attorneys conduct in not responding to the requests within 30 days was excusable because his office was understaffed and he was not even aware of the requests until receiving notice from the defendant. (*Elston, supra,* 38 Cal.3d at pp. 233–234.)

*Elston* is inapposite here. Unlike the situation there, in the instant case while in propria persona Young never responded to the requests or moved to withdraw the admissions, despite attending the January 6, 2017 hearing and being served with a copy of the court order a few days later. Nor did Young's counsel promptly (or otherwise) move to set aside the admissions and/or provide a response once he substituted into the case. And, unlike the instant case where we have found Young's and his counsel delay in moving to withdraw the admissions inexcusable, in *Elston* the plaintiffs' attorney's failure to respond to the requests was excusable. Finally, there was no finding of prejudice to the defendant in *Elston* if relief under former section 473, subdivision (b) had been granted, whereas in the instant case Kali relied on the admissions in preparing her case for trial. *Elston* therefore does not support Young's claim the trial court erred in denying his section 2033.330 motion.

## II

<u>Future Noneconomic Losses and Punitive Damages</u>

A. *Additional Background*

The record shows the jury was instructed with CACI No. 3905A as follows:

"1. Past and future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress.

"No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense.

"To recover for future mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress, Dawn Kali must prove that she is reasonably certain to suffer that harm.

"For future mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress, determine the amount in current dollars paid at the time of judgment that will compensate Dawn Kali for future mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress."

The record also shows the jury was instructed with CACI No. 3932, titled "Life Expectancy." The jury was told, "If you decide Dawn Kali has suffered damages that will continue for the rest of her life, you must determine how long she will probably live. According to the Vital National Statistics Reports in 2016, a 45-year-old female is expected to live another

33

38.8 years. This is the average life expectancy. Some people live longer and others die sooner.

"This published information is evidence of how long a person is likely to live but is not conclusive. In deciding a person's life expectancy, you should also consider, among other factors, that *person's health*, habits, activities, lifestyle, and occupation." (Italics added.)

During closing argument, Kali's counsel argued the evidence was uncontroverted that Kali suffered $576,000 in past medical expenses, and will incur $280,000 in future medical expenses, as Dr. Smith testified, for a total economic damage award of $856,000. The record shows the jury awarded Kali this exact amount.

Kali's counsel next turned to noneconomic losses. In discussing past noneconomic damages, Kali's counsel noted Kali's free time revolved around two things: her cancer treatment and her children. Counsel argued as follows in regard to loss of enjoyment of life: "[Kali] hasn't been in a relationship for four years because what is she going to do? In her own words, 'Hi, it's nice to meet you. I have terminal breast cancer, and I'm going to die in *three or four years*.['] So she hasn't been able to experience that joy and that comfort in the last handful of years of her life that being in a meaningful relationship would bring." (Italics added.)

After going through other items of past noneconomic loss, including physical pain, mental suffering, physical impairment, and emotional distress and humiliation, counsel made the following recommendation to the jury: "For the past, what she's experienced in the past for the period of time that she was getting those treatments. Three times the medical expenses. Three times is reasonable. I bet she'd 100 times rather be the doctor. So three times of what he gets paid is more than fair." Counsel thus recommended the

jury award Kali $2.568 million (i.e., $856,000 x 3). As noted, the jury ended up awarding Kali $5 million for past noneconomic losses, or almost twice the amount recommended by Kali's counsel. Young on appeal has not challenged either the award of economic or past noneconomic losses.

Kali's Counsel next turned to the award of future noneconomic losses. She argued that Kali was "not going to feel better"; that the "unfortunate reality is that [Kali] is going to feel worse and worse" and that instead of "planning for her future, she's planning for the end of her life." The record shows Dr. Smith's videotaped deposition was then replayed for the jury.

Kali's Counsel then argued as follows: "You heard that the life for someone who is 45 years old, like Dawn, should be another 38.8 years, but instead it's going to be more like three or four years. So Dawn *is losing 33 of her years*. A lot of those years should be the best years of her life.

"So how do you value that? . . . There is no easy way to value it. And there's something about putting a dollar figure to that kind of loss that seems almost offensive, right?

"But we can't give her those years back. I think we wish we could. And all we can do is give her money. That's our system of justice. That is all we have to compensate her for these incredible losses.

"[¶] . . . [¶]

"But your job is to put a figure on it. And so all I can is recommend something. That will be your job and only your job. What I am recommending is that for every year of her life that he took, that she be given a million dollars. [¶] Would she pay a million dollars for another single year with her family? Absolutely she would do it. Would she pay a million dollars to see her eight-year-old get married? Absolutely she would do it. So for the

33 years, $33.8 million." (Italics added.) As noted, the jury's award for noneconomic losses was $84.5 million.

Kali's counsel also made a recommendation regarding a punitive damages award. After arguing the various factors the jury was to consider, Kali's counsel recommended $10 million, adding that based on such an award, "maybe, maybe just maybe that will stop [Young] from doing this to more people." As noted, the jury awarded Kali $15 million in punitive damages.

The trial court subsequently found the jury's awards for future noneconomic losses and punitive damages excessive under section 657, subpart 5.[8] After weighing the evidence and determining such awards resulted from "passion and/or prejudice," the trial court remitted those awards to $10 million each, conditioned on the denial of the new trial motion if Kali accepted the reduced sums. Kali agreed. An amended judgment was entered awarding Kali $ $856,000 in economic (medical) losses; $15 million in past and future noneconomic losses; and $10 million in punitive damages, for a total award of $25,856,000 (excluding costs).

B. *Future Noneconomic Losses*

1. Guiding Principles

"Civil Code section 3283 states in part that '[d]amages may be awarded . . . for detriment . . . certain to result in the future.' Courts have interpreted this to mean that a plaintiff may recover if the detriment is 'reasonably certain' to occur. [Citations.] It is for the jury to determine the

_____

8    Section 657 provides in relevant part: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 5. Excessive or inadequate damages."

36

probabilities as to whether future detriment is reasonably certain to occur in any particular case." (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97.) "There is no requirement that a plaintiff prove with certainty the extent of the harm he [or she] has suffered as a result of the defendant's conduct. [Citation.] Although ' "[i]t is desirable . . . that there be definiteness of proof of the amount of damage as far as is reasonably possible[,] [i]t is even more desirable . . . that an injured person not be deprived of substantial compensation merely because he [or she] cannot prove with complete certainty the extent of harm he [or she] has suffered." ' " (*Id.* at pp. 98–99; see *Khan v. Southern Pac. Co.* (1955) 132 Cal.App.2d 410, 416 [recognizing it is "generally a question for the jury to determine from the evidence whether or not the claimed prospective detriment is reasonably certain to occur"].)

"The power of an appellate court to review the trier of fact's determination of damages is severely circumscribed. An appellate court may interfere with that determination only where the sum awarded is so disproportionate to the evidence as to suggest that the verdict was the result of passion, prejudice or corruption [citations], or where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court." (*Uva v. Evans* (1978) 83 Cal.App.3d 356, 363–364.)

" 'An appellate court . . . cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors.' " (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507.) Put another way, "[w]e review the jury's damages award for substantial evidence, giving due deference to the jury's verdict." (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 300 (*Bigler-Engler*).)

2. Analysis

We conclude that the $10 million award of future noneconomic losses is not supported by substantial evidence based on Kali's life expectancy, and therefore that it is legally excessive. As noted *ante*, the jury was instructed under CACI No. 3905A that to recover for future mental pain and suffering, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress, Kali "must prove that she is *reasonably certain to suffer that harm*." (Italics added.) The jury also was instructed under CACI No. 3932 that in determining life expectancy it should consider among other factors a person's "health."

Here, the record shows Dr. Smith testified that at the time of Kali's October 2018 trial, her type of aggressive breast cancer could be treated for about three or four more years and thereafter, it would be untreatable and she would succumb to the disease. Dr. Smith's testimony was unequivocal, and was based on his 25 years of experience as an oncologist. In addition, Kali's counsel during closing argued that Kali only had about three or four more years to live; that Kali was losing 33 years when compared to that of a "normal" 45-year-old woman whose life expectancy was 38.8 more years; and that the jury therefore should award Kali $1 million for each year lost.

We conclude Kali was entitled to future noneconomic losses measured by a life expectancy that was "reasonable and realistic, not a life expectancy based on the hope that [she] might miraculously live for dozens of more years." (*Johnson v. Monsanto Co.* (2020) 52 Cal.App.5th 434, 452 (*Johnson*) [reducing a jury's award to the plaintiff for future noneconomic losses to equate with the plaintiff's shortened probable life expectancy].)

" '[D]amages for future pain and suffering are based upon plaintiff's probable life expectancy in his or her injured condition. . . . [C]ompensation

38

for pain and suffering is recompense for pain and suffering *actually experienced*, and to the extent that premature death terminates the pain and suffering, compensation should be terminated.' (2 Stein on Personal Injury Damages (3d ed. 1997) Pain and Suffering, § 8:25, pp. 8-46 to 8-47, fn. omitted.)" (*Johnson*, *supra*, 52 Cal.App. 5th at p. 452.)

We believe the record in this case is sufficiently definite to determine the proper amount of noneconomic damages. Therefore we will exercise our power to remit the award to avoid further delay. (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 305.)

Limiting Kali's future noneconomic losses to those she is "reasonable certain to suffer" based on her probable life expectancy, we conclude that an appropriate award of such damages should be $5.8 million (i.e., 38.8 years less 33 years Kali is "losing," at $1 million per year as recommended by her counsel). This award is also based on Dr. Smith's testimony that Kali's cancer will no longer be treatable in about three or four years, measured from the time of trial (i.e., October 2018), and that she unfortunately will succumb to the disease. This award will compensate Kali for the greater number of years in which her cancer will respond to treatment (i.e., four), and for almost two more years thereafter when she ostensibly is no longer treatable.

Thus, the future noneconomic damages award is reversed for lack of substantial evidence. (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 306 [reducing noneconomic compensatory damages to maximum supported by the evidence].) If Kali does not accept the remitted $5.8 million future noneconomic losses award, the trial court should conduct a new trial on this issue.

C. *Punitive Damages*

Young contends that the punitive damages award of $10 million, even after it was remitted by the trial court, was excessive because his conduct was not reprehensible, he did not cause Kali harm, and there was a dearth of evidence to show his financial condition to support such an award. (See *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 619–620 (*Rufo*) [recognizing "three primary considerations govern the amount of punitive damages: (1) the reprehensibility of the defendant's conduct; (2) the injury suffered by the victims; and (3) the wealth of the defendant"].)

The jury here was instructed with CACI No. 3940 in part as follows: "If you decide that Robert Young's conduct caused Dawn Kali harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

"You may award punitive damages only if Dawn Kali proves by clear and convincing evidence that Robert Young engaged in that conduct with malice, oppression, or fraud."

After defining "malice," "oppression," and "fraud," the jury was instructed that in determining the amount of punitive damages, if any, it should consider: "How reprehensible was Robert Young's conduct"; "Is there a reasonable relationship between the amount of punitive damages and Dawn Kali's harm"; and "In view of Young's financial conduction, what amount is necessary to punish him and discourage future wrongful conduct."

With regard to Young's financial condition, the jury was further instructed with CACI No. 3940 in part as follows: "You may not increase the punitive award above an amount that is otherwise appropriate merely

40

because Robert Young has substantial financial resources.  Any award you impose may not exceed Robert Young's ability to pay."

The record shows up until the time of his arrest in early 2014, Kali, after she met Young in 2009, believed in Young and his treatment methods.  As Young taught, she also believed:  having a tumor was not a bad thing because it actually protected the rest of her body from what he claimed were "morbid molded cells" by encapsulating those cells; *she* was to blame for her cancer becoming worse because of her inability to stay fully committed to Young's strict liquid diet regimen and because of her "stinking thinking," a term he coined for those individuals whose negative thoughts interfered with his program's success; she should avoid conventional medical treatment for her cancer, including surgery and chemotherapy, because according to him conventional medical treatment would actually make her cancer worse, or even "kill" her; and she could trust him in light of his claim of being able to cure *her* cancer as he had done for "thousands" of others like her.

As also noted, Dr. Smith testified Young's treatment methods— including giving patients IVs of sodium bicarbonate, or baking soda, and Young's philosophy of reducing the acidity of blood through an alkaline diet, were not a cure for cancer; that there was no scientific evidence suggesting body pH was a risk factor for breast cancer; and that had Kali received medical treatment earlier, including in 2012 when she was under Young's care, Kali most likely would not have been in the situation in about July 2013 when Dr. Smith diagnosed her with Stage IV cancer.

Young denied advising Kali to avoid conventional medical treatment including having the lumps in her breast and armpit biopsied and if necessary, surgically removed.  He also denied giving her medical advice or treating her as his patient, including administering her IVs at the Center.  At

41

trial he reiterated his belief that his treatment program could help cure cancer, and had cured thousands of people. Although Young testified he felt sorry for Kali and her medical situation, he did not feel he had harmed her in any way, and thus was not remorseful.

We conclude the record, when viewed as a whole, contains ample evidence from which a reasonable trier of fact could have made the "high probability" finding required by the clear and convincing standard of proof that Young's conduct toward Kali was reprehensible and caused her injury. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006 [noting that in a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, a reviewing court evaluates whether the record as a whole contains sufficient evidence from which a reasonable fact-finder could have made the finding of " ' "high probability" ' " demanded by this standard]; *Rufo*, *supra*, 86 Cal.App.4th at pp. 619–620.) Clearly, the jury as factfinder weighed the evidence and the credibility of the witnesses, and found that Young's conduct was reprehensible and caused Kali harm.

Young also claims the punitive damages award was excessive because his net worth was not established at the time of trial. The record, however, shows that Young was less than forthcoming regarding his financial condition. Indeed, he testified at trial that his only source of income was about $1,000 he received monthly from Social Security, and small fees he sometimes received for giving talks and lectures.

The jury, however, was not required to, nor did it appear to believe, Young's testimony regarding his income and financial net worth in determining his "ability to pay" punitive damages. (See CACI No. 3940.) Indeed, the jury heard testimony that Young receives income from a company he formed after his criminal conviction, Forever Young, which was selling

nutritional supplements out of a warehouse located at the Center; that the 40-plus acre Center continues to hold many events drawing large number of guests, including in one instance hosting 83 guests for a grand opening; that although he transferred ownership of the Center to a trust, he is one of the trust's beneficiary, with his son acting as trustee; that there are six cottages/guesthouses located on the grounds of the Center which are rented out, including on a short-term basis; that in 2016, he sought to sell the Center property for $3.9 million; that he continues to give talks and presentations regarding his treatment methods, including internationally as demonstrated by his appearance in June 2018—just a few months before trial in this case commenced—as a "keynote speaker" at the "3rd International Conference on Pancreatic Cancer and Liver Diseases" held in Rome, Italy; that he has sold over 10 million copies of his books, which are still available for purchase; and that he has "clients in over 160 countries around the world."

Young also generally confirmed the revenue earned by pH Miracle Living in 2011 and 2012, as testified to by then company accountant Asisi, summarized *ante*. Young's best estimate was that pH Miracle Living earned about $3 million in revenue in 2013; $2 million in 2014; and between $500,000 and $1 million in 2015. He also confirmed that sometime in 2015 or 2016, pH Miracle Living was shut down—during the pendency of this litigation—and he started his new company. Young estimated his new company generated revenue of about $500,000 in 2016.

Also during the pendency of this litigation, Young testified he and his former wife Shelly entered into a stipulated divorce. As part of that stipulation, Young for a $1 or $10 transferred to Shelly a Utah property they

43

co-owned. As also part of their stipulation, Young transferred to Shelly certain royalties he receives from product sales.

The record thus supports the finding that Young's income at the time of trial was substantially greater than the $1,000 monthly Social Security check he received and the small fees he earned for speaking engagements. This evidence also supports the finding that Young took steps to hide his true net-worth, including transferring the 40-plus acre Center in Valley Center to a trust, while he remained a beneficiary of the trust and still resided on the property; and transferring the Utah property he and his former wife Shelly co-owned to her for merely $1 or $10.

Where a defendant engages in conduct intentionally designed to hide the proverbial ball with respect to the defendant's assets, a trier of fact has wide latitude to draw inferences form the evidence unfavorable to the defendant with regard to the defendant's ability to pay punitive damages. (See *County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 546 (*Walsh*) [noting that while a "defendant's 'net worth' is the critical determinant of financial condition, . . . there is no rigid formula and other factors may be dispositive especially when net worth is manipulated and fails to reflect actual wealth"]; see also Evid. Code, § 413 [providing: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his [or her] testimony such evidence or facts in the case against him [or her], or his [or her] willful suppression of evidence relating thereto, if such be the case"].)

We find this general rule applicable in the instant case, where there was sufficient evidence to support the finding that defendant was less than candid regarding his income, assets, overall net-worth, and his ability to pay

punitive damages.  We therefore conclude the remitted, $10 million punitive damages award, was not excessive.  (See *Walsh*, *supra*, 158 Cal.App.4th at p. 546.)

## DISPOSITION

The amended judgment awarding Kali future noneconomic losses is reversed.  The superior court is directed to conduct a new trial on future noneconomic losses *unless* Kali agrees to the conditional remitted award of $5.8 million.  If she agrees to the remitted award, within 30 days of the date of this remittitur Kali must consent in writing, file with the clerk of the superior court, and serve on all parties her acceptance of such.  If Kali consents to the remitted award, the superior court shall conduct any further proceedings that are necessary and appropriate and enter judgment consistent with this opinion.

In all other respects, the amended judgment is affirmed.  The parties shall bear their own costs of appeal.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

45